May it please the Court, Jeffrey Dickerson from Reno, Nevada, appearing on behalf of Appellant Greg Gilmore. We come here after a bench trial with Magistrate Judge McQuaid. Following that bench trial, Judge McQuaid entered findings of fact and conclusions of law that we're here to challenge under the onerous standard of clearly erroneous. In other words, we have to demonstrate to the Court, and the Court has to be convinced that our position on these points leaves it with a definite and firm conviction that an error was made. With respect to our first point in that regard, is whether or not consent was given. Dr. Plescia could not remember this particular consent-giving process, and so he relied upon, and the government relied upon, habit and routine practice, and allowed Dr. Plescia to testify to his routine practice of giving consent, which would include mentioning local nerve injury with possible chronic pain syndrome. Did the patient have some forgetfulness, too? The patient did have some forgetfulness about a lot of things, Your Honor. But the point is, we're not disputing that because that's part of the record. I understand, but if the patient forgets things and testifies that the doctor, I can't remember the doctor giving me any kind of information about the outcome of this surgery, that doesn't necessarily prove that the doctor didn't give prior, or get prior consent. I would agree with that, Your Honor. And the doctor said, as usual, and customary practice, is to give it, and he may not contemporaneously enter it in the medical notes of the hospital record, and that he would do so later. And, in fact, the later entry's made, right? No. No entry at all? No entry. Yeah, what happened was, I had Dr. Plescia on the stand and I said, what's your usual practice when you do this? And he makes an entry in the chart, the actual progress notes that were in front of him at the time he was testifying. I asked him if he found any such note anywhere because he had been through a deposition and now he's in trial, he's reviewed the whole chart, and he said he didn't. We didn't either. Government didn't either. So there is no note. And his usual practice is to not just chart some doctors, such as in the chart itself, you see permit obtained or words to that effect. This doctor is much more thorough, according to his testimony, on his usual practice. When he gives consent to a patient before going into the operating room, before anesthesia is administered, he tells the patient, here's the procedure, he palpates to make sure that there's a hernia there to operate on, tells him what we're going to do, looks at the chart to make sure there's no glaring reasons not to do the operation, and then explains to the patient what we're going to do and what the risks are. And he includes the risk we're talking about here in that pitch. And when he does that, he charts it as he's standing there with chart in hand and makes an entry that specifically states what risk. I asked him, what do you mean by that? Words to that effect. And he followed up and he said, because I thought maybe he just said permit obtained or consent obtained. He said he actually writes down the risks that are explained and what the procedures are. Well, did the patient sign anything saying that he consented to the surgery? Sure. He signed a permit consent form that did not delineate this particular risk, however. But it listed a whole bunch of other ones, such as death and dismemberment and all the usual stuff. Oh, yeah. The whole litany. Right. But it left out specifically nerve damage. Yeah. That was the other things are systemic types of reactions. And bleeding, of course, would be a local reaction. But nerve nerves or nerve injury was not contained in that permit. So my point, Judge Beezer, granted, the plaintiff was not only forgetful about that particular event, but other things around that. You know, he didn't remember various things that happened around that time. He testified that he never saw Dr. Plescia when the chart indicates that about a month after the surgery, he saw Dr. Plescia. So I'm not here saying that the plaintiff has a genius memory at all or a steel trap memory. No, no. But but there's a tension between the two parties. And and one says, I did it. The other one is forgetful and didn't say it was done or wasn't done, really. Right. To that extent. But then and then you've got to try a fact that's got to figure this all out. Well, I think under the clearly erroneous standard, if you if you're going to say, I, I believe Dr. Plescia did it because he says that's his routine practice. Remember, he didn't say, I remember I did it. He said, I don't remember, but it's my routine practice. Yeah. And I said, OK, what what about this other part of your routine practice? That's what I'm arguing. It's all part and parcel. If if if it's reasonable to infer that consent was given, if he gave the speech, then you've got to have the writing to go along with it. If you're going to believe Dr. Plescia, because that's what Dr. Plescia's routine is. The writing is not necessary to if the doctor says this is my usual and customary manner of pre-briefing a surgery of this type, it covers all the waterfront. And that's the only evidence before the court. You're going to say the doctor didn't give it. No, I'm going to lose that. I'm going to win now because hopefully because there's your fellow doesn't remember. My fellow doesn't remember. But I've got. How can you make a logical inference if part and parcel of the same routine is not only speaking it, but writing it down in the chart and you have the absence of number two of that equation? It's not logic logical to take the inference further and say that that routine was followed in this occasion. The only logical inference from that is it wasn't followed because Dr. Plescia can't say whether it was or wasn't. So the only indicia of whether it was or wasn't is the chart and there's nothing in the chart, ergo, that inference doesn't isn't it's not supported by the evidence. But the the one premise of his testimony still stands uncontradicted that he did, in fact, give the warnings he could not remember. He said it's a matter of custom and practice. I give the warning. That's correct. And that testimony stands uncontradicted. And so it is that he is custom and practice did not enter anything in the book. Right. And why is that clearly erroneous? Why was judgment equates conclusion clearly erroneous on the basis of that evidence? Because he completely disregarded the second part of that. Even when we made our post-trial motion, he didn't fix it. How can you say that this routine was followed if it wasn't followed in totality? It makes no sense. You can't reach that conclusion. Was there any evidence that there were this form that was signed was an exception to the normal routine? No. The form the form was Dr. Plescia says I have nothing to do with the form and I don't rely upon the form. I do the talking before the operation. Just at Dr. Plescia. Okay. Yeah. However, the form was signed about a week earlier. Okay. Counsel, you're down to three different doctors altogether. One was before the surgery and then the surgeon and maybe the anesthesiologist. And then there was a post-surgical doctor that came in. Yeah, there was Dr. Caparata. He came in. They were all involved one way or the other. But the form he signed on admission is the form that most patients sign on admission to any hospital. They sign away all the rights that they can get them to sign. But not that specific risk. But not the specific nerve damage thing. Right. I understand my time, Your Honor. The other issues are causation issues, and I think my brief covers those. And if there's any questions on rebuttal, I'll come back. Very good. You've got a minute and a half. Counsel? Thank you, Your Honor. May it please the Court. My name is Greg Addington, Assistant United States Attorney for the District of Nevada in Reno. It was my privilege to represent the United States in the district court proceedings as well as before this court. Medical malpractice matter that was tried to the district court under the Federal Tort Claims Act. There were no evidentiary issues in terms of admissibility of evidence. The material came in, documentary evidence, testimony of various witnesses. Some of the testimony was non-controversial, non-conflicting. Obviously, some of the testimony was conflicting. That's why we had a trial. In the face of that conflicting testimony and evidence, the district court did what district courts do every day when they sit as triers of fact in a bench trial. The district court evaluated the evidence, weighed the evidence, evaluated the witnesses who presented that evidence, and made findings of fact. That's what district courts do. The findings, which are the focus of this appeal, were supported by evidence. They were contradicted by other evidence. And the district court was obliged, as it does every day, to evaluate how to resolve that conflict, if possible. And if it couldn't be resolved, then to choose how to make a finding that was compatible with the district court's evaluation of the record as a whole. That's what the district court did. The findings, which are the focus of this appeal, were not clearly erroneous, because they were supported by credible, reliable evidence, testimony that was presented. On the issue of consent, which was the focus of much of counsel's remarks to the court this morning, Mr. Gilmore testified that this particular risk was not identified pre-surgery. Clearly, that's what he said. If that was the only evidence that was presented, the only testimony that was presented on that issue, the district court very likely would have been obliged to make a finding corresponding to that testimony. But that was not the only testimony, not the only evidence that was presented. Dr. Plescia, as you've already heard in a previous colloquy, testified about his practice, his routine, to meet with patients prior to surgery, particularly a patient that he had never seen before. This particular patient was followed pre-surgery by another doctor, Dr. Bienfeld, who did some of the pre-surgery workup. Well, didn't they do a second operation of exploratory? Yes, Your Honor. About a year and a half later, Dr. Caffaretta did a surgery, had a rather comprehensive discussion that's not only reflected in the record, but which Dr. Caffaretta testified to about the pre-surgical risks associated with that second surgery. Mr. Gilmour remembered nothing about what Mr. Caffaretta, Dr. Caffaretta, said to Mr. Gilmour. And I think that ties into the general theme of what the district court was presented with. One witness who was clearly not a reliable historian, it's not his fault, but that was the fact, he was not a reliable historian. He did not remember anything of what Dr. Bienfeld had said to him about the risks of this surgery, namely, recurrence of the hernia, bleeding, infection. He didn't remember any of that, even though clearly that's charted in the record, and Dr. Bienfeld testified about that. He didn't remember ever meeting Dr. Plescia, never seeing Dr. Plescia until the time of trial, even though the record plainly reflected that he did meet with Dr. Plescia post-surgery. And of course, Dr. Plescia's testimony that he always talks to his patients prior to surgery, particularly one that he's never met before, even though that pre-surgery meeting or conversation between Dr. Plescia and the patient is nowhere reflected in the chart, I have to acknowledge that. Dr. Plescia's clear testimony was that he would never operate on somebody without talking to that patient prior to surgery. The fact that it's not reflected in the chart does not mean that it didn't happen. I know there's this general notion out there that if it isn't in the chart, it didn't happen. Well, plainly, Dr. Plescia met with this patient prior to surgery. The issue at trial was, what did Dr. Plescia say to the patient prior to surgery? And we have Dr. Plescia's testimony. He doesn't remember this patient. That's not surprising. But he did testify that, first of all, he never operates on somebody he's never spoken to. So he did speak to this patient, and then he described what he says every time he is preparing for a hernia repair surgery on a patient. And he talks about nerve damage, among other things. There was one thing in the magistrate's findings that I found a little bit intriguing, and that is he emphasized how eager Gilmore was to get this thing fixed. Because he was in constant pain, he was having trouble on the job because of lifting, and so he was fairly aggressive about getting the treatment. And the magistrate said, therefore, in effect, therefore, I'm sure he consented. And that is – I was wondering if that is an appropriate evidentiary finding, to say he was so eager to get this treatment, I'm sure he must have consented. I think it's common sense, but I don't know how – what good evidence that is. I think the findings that the Court is referring to don't go so much to the consent details, but to the other component of an informed consent-related case. And that is that, first of all, you have to establish that the consent was not given properly. The magistrate and judge, of course, made a finding contrary to that. But even if he did, even if the consent was not proper, the plaintiff in an informed consent case must then establish that if that consent – if that risk had been identified, that the patient would have said no to the procedure. And so the findings that the magistrate and judge made, that Your Honor just mentioned, went to that other component of an informed consent case. I would not have consented had I known about the nerve damage. Right. And there we had Dr. Caffaretti's testimony that he has never had a patient turn down a hernia repair based on the risk of nerve damage. Dr. Pleschett testified to the same thing, many years of experience in hernia repairs and consents represented by those two gentlemen. And then, of course, Mr. Gilmour's testimony stands alone, saying he was indeed very aggressive, very interested in getting this repaired. It was bothersome, more painful. It was getting worse, interfering with his work life because he had a job that involved heavy lifting and moving things around. He was very interested. And by his own testimony, he said he wasn't even paying attention to the risks that were being described by Dr. Dienfeld. He doesn't remember what she said. He was not – his actual words were, I wasn't focusing on the risks. I was focusing on getting this taken care of. And that was his testimony. And that supports the second component of this informed consent case, that the district court's finding that he would have proceeded with the surgery anyway if Dr. Dienfeld had said, oh, by the way, there's also risk of nerve damage. Well, Mr. Gilmour wouldn't have paid any attention to that because he wasn't paying attention to any of the other things. And if Dr. Pleschett had said that as his testimony reflected, that wouldn't have caused a halt to the process either. There's one last component to this, and that is that the pain symptoms, the post-surgery pain symptoms that Mr. Gilmour has weren't caused, are not being caused by nerve damage. That's part of an informed consent-based as well, is that the undisclosed risk actually has to materialize. And here we have Dr. McHugh, the only person who testified with experience in pain management, complex pain management. He testified, this is not nerve damage. This is not nerve entrapment. And that's also supported by the testimony of Dr. Caffaretta, who said this is not a nerve entrapment matter. Dr. Pleschett, this is not a nerve entrapment supported by the medical records that they were referring to. The various people, Dr. Watson and Dr. Hicks, whose reports were submitted to the district court and the witnesses looked at those reports and interpreted them, saying this is not a typical response to a nerve entrapment issue. This is a much more complex pain syndrome, as Dr. McHugh described. And even Dr. Saunders, who testified by telephone from Florida, who was actually managing, or was at the time of the trial, managing Mr. Gilmour's pain symptoms. He said, I don't know where this is from. It doesn't appear to be related to the hernia surgery. I would defer to a neurologist. And of course, Dr. McHugh was that neurologist who testified. So at every point, at every evidentiary burden, Mr. Gilmour's case failed. Dr. Pleschett did disclose the risk. Even if that risk wasn't disclosed, Mr. Gilmour would have proceeded with the surgery anyway, because he was highly motivated. And the actual risk didn't materialize. Thank you, counsel. Your time has expired. Helen has some reserve time. Mr. Dickerson? Very briefly, Your Honor. Honors. Eager to get it fixed. The question is, no one, you just heard that both doctors said nobody's refused a hernia operation, even with the risks explained. And I would submit that common sense tells you that no plaintiff in one of these cases is going to answer the question the wrong way. When his plaintiff's lawyer asks him, would you have gone forward with the surgery if the risk had been explained to you, they're going to lose the case. So you're bound to have that answer, and that's why this reasonableness standard is adopted in Nevada under the Smith case. We don't look at what the real testimony of the plaintiff is. I mean, that's one factor in the four factors to be considered. But the most important factor is, were there reasonable alternatives here? And Dr. Bienfeld testified that she explained to Mr. Gilmour that a reasonable alternative, she didn't tell him about the nerve damage, but she did tell him the alternative was no surgery. And Dr. Capirotta testified in no uncertain terms that this was a safe hernia. It was reducible on examination. It was not in immediate danger of becoming strangulated or being a threat to the patient. And so he had alternatives. He testified that if he had been given this information, he would have wanted to look into it further. And that's the end of the hunt. Whether he would have come back for surgery after looking into it is another question for another day. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and we will hear argument in Bustamante versus
judges: Goodwin, Beezer, O'Scannlain